STATE OF IOWA, Appellant, v. THE UNITED STATES EXPRESS Co., Defendant, and THE HAMM BREWING COMPANY, Intervener, Appellees.

Intoxicating liquors: INTERSTATE SHIPMENT: NUISANCE: INJUNCTION:
1  EXPRESS COMPANIES. In view of what is known as the Webb-Kenyon Act of Congress, prohibiting the interstate shipment of intoxicating liquors intended by any person to be received, sold or used in violation of the law of the state to which shipped, a suit in equity will lie to enjoin an express company from transporting, delivering and distributing an interstate shipment of intoxicating liquors in a certain county, contrary to the statutes of this state.

Same: STATUTES:  CONSTITUTIONALITY:  PENALTY. A valid civil
2  statute, either state or federal, may be enacted without providing therein any penalty or sanction. If the penalty or sanction follows as a matter of course it need not be written out in the enactment itself. Thus the Webb-Kenyon Act of Congress which is remedial and not penal in character, is not void because containing no penal provision for its enforcement.

Interstate commerce: POWER TO REGULATE. The power to regulate
3  interstate commerce is delegated by the constitution exclusively to congress; it cannot be exercised by the states.

Same: CONSTITUTIONAL LAW:  DELEGATION OF CONGRESSIONAL POWER.
4  The Webb-Kenyon Act prohibiting the importation of liquors into a state to be then used in violation of the state law, does not expressly delegate any power to the states to act for congress in

the matter of interstate commerce; but is rather prohibitory in character, acting upon articles of commerce and not upon the states, is complete in itself and either permissive in its nature or adoptive of the laws of the state, and is not unconstitutional as a delegation of congressional power.

Same:  CONSTITUTIONAL LAW: EQUAL PROTECTION.  The fact that the Webb-Kenyon Act prohibits the shipment of liquors into a state to be used in violation of its laws is not an arbitrary and unjust classification, amounting to a denial of the equal protection of the law; as it is undoubtedly within the power of congress to prohibit some interstate shipments and to permit others.

Same:  CONSTITUTIONAL LAW: SPECIAL PRIVILEGES.  The Webb-Kenyon Act is uniform in its operation, and grants no special privileges or immunities to citizens of one state not possessed by others under the same circumstances.

Same:  CONSTITUTIONAL LAW: DUE PROCESS.  There is no absolute right on the part of any one to sell liquor in any state. It is wholly a matter of police regulation; and the Webb-Kenyon Act neither gives nor protects such right. And in prohibiting the shipment into a state to be used in violation of its laws the act deprives no citizen of his property without due process.

Same:  INTERSTATE COMMERCE: REGULATION OF LIQUOR TRAFFIC.  The manufacture, sale and transportation of liquor is subject to the police power inherent in the state, and may be regulated by the legislature in such reasonable manner as it may think best for the welfare of its citizens; and congress has power to prohibit the shipment of liquor into a state having a prohibitory law, thus taking it out of the sphere of interstate commerce when within such state, and thereby supplementing the state law.

Same:  CONGRESSIONAL LEGISLATION: RE-ENACTMENT OF STATE LAW.  After the passage of the Webb-Kenyon law prohibiting the transportation of liquor into a state to be used illegally, thus divesting it of its character as an interstate shipment, it is not necessary for the state to re-enact its laws regulating the sale and transportation of liquor to make them effective.

*Appeal from Wapello District Court.*—HON. F. M. HUNTER, Judge.

VOL. 164 IA.—8

TUESDAY, FEBRUARY 17, 1914.

ACTION in equity to enjoin an alleged liquor nuisance; to enjoin defendant from distributing or delivering intoxicating liquors, or aiding in the distribution or delivery thereof, contrary to law, from transporting, conveying, and carrying, or distributing liquors, either in cars, wagons, or otherwise, contrary to law, in Wapello county, Iowa, or in the judicial district in which said county is located; for attorney's fees, etc. The defendant answered, pleading in substance that it is a common carrier, engaged in interstate commerce; that all that it did, or was charged with doing, was shipping intoxicating liquors in interstate commerce, without knowledge of any unlawful intent on the part of the consignee. It also pleaded that it did not violate any of the laws of this state or of Congress, and that, if said laws are so construed as to make their acts illegal, they are in violation of the Constitution of the United States, and of the state of Iowa. The Hamm Brewing Company, a corporation organized under the laws of, and doing a brewing business in, the state of Minnesota, intervened, claiming that it was engaged in the manufacture and sale of intoxicating liquors, in interstate commerce; that such business is lawful, and that it was using the express company as a means for doing its business; that it was making sales to different persons in many states, to individuals for their own personal use, as well as for sale after delivery to them. They also pleaded the unconstitutionality of the laws of this state and of Congress, particularly if they be held to prohibit the sale and delivery to a common carrier of intoxicating liquors for transportation to a nonresident of the state in which they do business, and for the consignee's own personal use. The case was tried to the court on these issues, resulting in a decree dismissing plaintiff's petition, and the appeal is from that decree.—*Reversed* and *Remanded.*

*George Cosson*, Attorney General, *L. H. Salinger, Chester W. Whitmore, C. A. Robbins*, and *George L. Gillies*, for the State.

*Parker, Parrish & Miller* (*Lawrence Maxwell* and *Joseph S. Graydon*, on the brief), for appellee United States Express Co.

*E. R. Mitchell*, (*Lawrence Maxwell* and *Joseph S. Graydon*, on the brief), for appellee Hamm Brewing Co.

DEEMER, J.—The nature of the action as indicated by the prayer of the petition has already been stated; but to fully understand the case, it is deemed advisable to quote some of the allegations of that petition. They are, in substance, as follows: "That the defendant, the United States Express Company, is and was at all the times hereinafter mentioned a corporation possessed of and using certain cars which it leases and also possessing certain horses and wagons, and was a common carrier for hire, carrying goods, wares, and merchandise to and from the city of Ottumwa, Wapello county, Iowa, over the line of railway used and operated by the Chicago, Rock Island & Pacific Railway Company. That upon the arrival of said goods, wares, and merchandise in the said city of Ottumwa, the defendant uses said horses and wagons in delivering the said goods, wares, and merchandise to the consignees thereof in said city, hauling the same through the streets and alleys of said city. That for many weeks since March 4, 1913, and prior to the institution of this action, defendant has been, and still is, engaged in transporting, conveying, delivering, and aiding in delivering and distributing to persons in said city of Ottumwa and county of Wapello, large quantities of intoxicating liquors, without first having been furnished with a certificate from the clerk of the court issuing the permit, showing that the consignee is a permit holder and authorized to sell liquors in the county of Wapello

and state of Iowa, aforesaid. That a very large part or portion of the persons to whom said intoxicating liquors are conveyed and delivered, thereafter sell, barter, and deliver the same in violation of the prohibitory laws of the state of Iowa, and that defendant well knows this to be a fact. That in so transporting, conveying, delivering, and aiding in delivering and distributing the intoxicating liquors as aforesaid the defendant uses said cars, horses, wagons, and office. That by reason of the premises the said cars, horses, wagons, and office so used in transporting, conveying, delivering, and distributing the intoxicating liquors as aforesaid, and in aiding in delivering and distributing the same, constitute a nuisance, and the defendant has established and is using and maintaining a nuisance.'' We do this to show that this is not a criminal proceeding or an action to enforce a penalty under section 2419 of the Iowa Code of 1897. The plaintiff in its pleading seems to place some reliance upon that section, doubtless to show that the act of transporting liquor after it is brought into this state in interstate commerce is interdicted by our law, and in doing these acts it was unlawfully handling liquors, or aiding and abetting others therein for the reason that the handling of liquor in this state is unlawful, and that all who aid or abet therein are guilty of a nuisance, and may be enjoined in a civil proceeding. So much for the issues.

The case was tried upon a stipulation, and certain concessions of fact, supplemented by some oral testimony, and the trial court made the following, among other, findings of fact:

The provisions of the mulct law contained in the statutes of Iowa have not been in force in Ottumwa at any time on or since March 4, 1913. That on March 14, 1913, the defendant received from the Hamm Brewing Company of Rock Island, Ill., at its (the defendant's) office at Rock Island, Ill., one case of beer consigned to J. Erbacher at Ottumwa, Iowa, and that it transported the case of beer from Rock Island, Ill., to Ottumwa, Iowa, and there delivered the same to said J.

Erbacher, consignee, on the 21st day of March, 1913, who receipted therefor and paid the defendant the regular tariff rate thereon. That on various dates since March 14, 1913, the defendant received at its office in Rock Island, Ill., from the same consignor consigned to the same consignee, at Ottumwa, Iowa, divers cases of beer, which it transported and delivered to the consignee in like manner and effect as the shipment made March 14, 1913. That in each instance of shipment above referred to, the consignors were lawfully engaged in the sale and shipments of intoxicating liquors at Rock Island, Ill., and the consignees, respectively, purchased the beer and liquors from the respective consignors, and paid for the same at Rock Island, Ill., and that each of said purchases and sales were lawful in so far as concerns the laws of the state of Illinois. That in each of the shipments of beer and liquors referred to, the cases and packages were marked and labeled in all respects in conformity with law, were shipped by continuous carriage from Rock Island, Ill., to Ottumwa, Iowa, and there delivered to the consignees, and that the defendant company had no title to or interest in said beer and liquors or any part thereof, except as a carrier for hire and the legal tariff shipping rates thereon. That during the time ever since March 4, 1913, said J. Erbacher had and possessed a residence in Ottumwa, Iowa, but did not have or possess a place where he engaged in lawful business; and during all of that time he had no right to keep with intent to sell, or sell, intoxicating liquors in Iowa to any person or for any purpose whatsoever, and that the beer and liquors delivered to J. Erbacher by the defendant were not delivered to him at his residence or any established place of lawful business in Ottumwa, Iowa, but elsewhere in said city; and these facts were well known to the defendant at the time of the delivery, by it, of the beer and liquors above mentioned. I further find that at the time, and each of the times, that J. Erbacher purchased the liquors above mentioned, and during the time they were being transported and delivered to him, and after they were delivered to him, he was the sole person interested therein, and he intended, all of the time, to receive and possess with intent to sell the beer and liquors in Ottumwa, in violation of the laws of the state of Iowa. That his purpose and intent in the purchase, possession, and use of the liquors from the time of purchase was made, and while being transported, and as long as the liquors were in his

custody and control, was to sell the same in violation of the laws of the state of Iowa. The defendant at the time of the delivery of the beer and the liquors to J. Erbacher did not have notice or actual knowledge that he was buying or receiving the same with the intent and purpose of selling it in violation of law, but was in possession of such facts that, upon reasonable inquiry, it would have ascertained he was buying and receiving and holding the beer and liquor with intent to sell the same in violation of the laws of Iowa, and is therefore chargeable with such knowledge.

These findings of fact are not challenged by any of the parties to the controversy, and we need only say in this connection that, in so far as this case is concerned, the question of purchase and shipment to a consignee for his own personal use is entirely eliminated, as was the question of the criminal liability of either the defendant or the intervener. The findings of fact, even if challenged, have sufficient support in the testimony, and we accept them as correct.

I. It is also conceded, as we understand, that in virtue of our prohibitory law, and the procedure provided for the enforcement thereof, this action in equity would lie as against the defendant express company, were it not for the fact that what it did, and was charged with doing, was in its capacity as a common carrier, engaged in interstate commerce. In the absence of such a concession, we should find as a matter of law that such an action will lie, under section 2382 of the Code Supplement of 1907, sections 2384 and 2405 of the Code, section 2406 of the Code Supplement, sections 2419, 2427, and 2431 of the Code, and sections 2461-a and 2461-b of the Code Supplement. These read as follows:

Section 2382 (Suppl.) :

1. INTOXICATING LIQUORS: interstate shipment: nuisance: injunction: express companies.

No one, by himself, clerk, servant, employee or agent, shall, for himself or any person else, directly or indirectly, or upon any pretense, or by any device, manufacture, sell, exchange, barter, dispense, give in consideration of the pur-

chase of any property or of any services or in evasion of the statute, or keep for sale, any intoxicating liquor, which term shall be construed to mean alcohol, ale, wine, beer, spirituous, vinous, and malt liquor, and all intoxicating liquor whatever, except as provided in this chapter, or solicit, take, or accept any order for the purchase, sale, shipment, or delivery of any such liquor or aid in the delivery and distribution of any intoxicating liquor so ordered or shipped, or own, keep, or be in any way concerned, engaged or employed in owning or keeping any intoxicating liquor with intent to violate any provision of this chapter, or authorize or permit the same to be done; and any clerk, servant, employee or agent engaged or aiding in any violation of this chapter, shall be charged and convicted as principal. Provided, that nothing herein shall prohibit traveling salesmen soliciting orders for the purchase, sale, and shipment of intoxicating liquors, from persons legally authorized to sell or dispense the same.

Code, section 2384:

Whoever shall erect, establish, continue or use any building, erection or place for any of the purposes herein prohibited, is guilty of a nuisance, and upon conviction shall pay a fine of not less than three hundred nor more than one thousand dollars and costs of prosecution, which shall include a reasonable attorney's fee to be taxed by the court, and stand committed to the county jail until such fine and costs are paid, and the building, erection or place, or the ground itself, in or upon which such unlawful manufacture or sale or keeping with intent to sell, use or give away said liquors is carried on or continued or exists, and the furniture, fixtures, vessels and contents, are also declared a nuisance, and in addition to the penalties hereinbefore affixed, shall be abated as hereinafter provided.

Code, section 2405:

Whenever a nuisance is kept, maintained or exists, as defined in this chapter, any citizen of the county may maintain an action in equity to perpetually enjoin and abate the same. In such action the court, or a judge in vacation, shall,

upon the presentation of a petition therefor, allow a temporary writ of injunction without bond, if it shall be made to appear to the satisfaction of the court or judge, by evidence in the form of affidavits, depositions, oral testimony or otherwise, as the plaintiff may elect, unless the court or judge, by previous order, shall have directed the form and manner in which it shall be presented, that the nuisance complained of exists.   Three days' notice in writing shall be given the defendant of the hearing of the application, and, if then continued at his instance, the writ as prayed shall be granted as a matter of course.   When an injunction has been granted, it shall be binding on the defendant throughout the judicial district in which it was issued, and any violation of the provisions of this chapter by manufacturing, selling or keeping for sale of intoxicating liquors anywhere in said district shall be punished as a contempt, as provided in this chapter.

Section 2406 (Suppl.) :

Actions to enjoin nuisances may be brought in the name of the state by the county attorney, who shall prosecute the same to judgment, or any citizen of the proper county may institute and maintain such a proceeding in his name.   The action when brought shall be triable at the first term of court after due and timely service of notice of the commencement thereof has been given; and in such action evidence of the general reputation of the place described in the petition shall be admissible for the purpose of proving the existence of such nuisance.   If the plaintiff is successful in the action, an attorney's fee of twenty-five dollars shall be taxed as costs in his favor.

Code, section 2419 :

If any express or railway company, or any common carrier, or person, or any one as the agent or employee thereof, shall transport or convey to any person within this state any intoxicating liquors, without first having been furnished with a certificate from the clerk of the court issuing the permit, showing that the consignee is a permit holder and authorized to sell liquors in the county to which the shipment is made,

such company, common carrier, person, agent or employee thereof, shall, upon conviction, be fined in the sum of one hundred dollars for each offense and pay the costs of prosecution including a reasonable attorney's fee to be taxed by the court. The offense herein created shall be held committed and complete and to have been committed in any county in the state in which the liquors are received for transportation, through which they are transported, or in which they are delivered. The defendant in a prosecution under this section may show by a preponderance of the evidence as a defense that the character, circumstances and contents of the shipment were not known to him, or that the person to whom the shipment was made had complied with the provisions of this chapter relating to the mulct tax.

Code, section 2427:

In all actions, prosecutions and proceedings under the provisions of this chapter, proof of the actual manufacture, sale or gift in evasion of the statute of intoxicating liquors by a person not authorized to manufacture, sell or give the same shall be presumptive evidence of illegal manufacture or sale, and the finding of intoxicating liquors in the possession of one not legally authorized to sell or use the same, except in a private dwelling house which does not include or is not used in connection with a tavern, public eating house, restaurant, grocery, or other place of public resort, or the finding of the same in unusual quantities in a private dwelling house or its dependencies of any person keeping a tavern, public eating house, grocery, or other place of public resort, shall be presumptive evidence that such liquors are kept for illegal sale. The fact that any person not authorized to keep for sale and to sell intoxicating liquors for lawful purposes, engaged in any kind of business, has or keeps posted in or about his place of business a receipt or stamp showing payment of the special tax levied under the laws of the United States upon the business of selling distilled, malted or fermented liquors, or shall have paid such special tax for the sale of such liquors in this state, shall be presumptive evidence that the person owning or controlling such receipt or stamp, or having paid such special tax, is engaged in keeping

for sale or selling intoxicating liquors contrary to the provisions of this chapter.

Code, section 2431:

. Courts and jurors shall construe this chapter so as to prevent evasion.

Section 2461-a (Suppl.) :

Any person who shall, by himself, or his employee, servant or agent, for himself or any person, company or corporation, keep or carry around on his person, or in a vehicle, or leave in a place for another to secure, any intoxicating liquor as herein defined, with intent to sell or dispose of the same by gift or otherwise, in violation of law, shall be termed a bootlegger.

Section 2461-b (Suppl.) :

Every such bootlegger may be restrained by injunction from doing or continuing to do any of the acts prohibited by law, and all the proceedings for injunctions, temporary and permanent, and for fines and costs for violation of same, as defined by law, shall be applicable to such person, company or corporation, and the fact that an offender has no known or permanent place of business or base of supplies, or quits the business after the commencement of an action shall not prevent a temporary or permanent injunction, as the case may be, from issuing.

Again, it must be conceded that, before the passage by · Congress of what is known as the Webb-Kenyon Act (Act March 1, 1913, chapter 90, 37 Stat. 699), plaintiff's action would not have lain, for the reason that the shipment and sales in question, being in interstate commerce, were beyond and outside of state legislation because under the federal Constitution such power—that is, the regulation and control of interstate commerce—is, generally speaking, exclusively vested

in Congress. But Congress in passing the Webb-Kenyon Act
referred to has acted, and the ultimate question here is, first,
the nature of the enactment, and, second, the constitutionality
thereof. It was passed over the President's veto, March 1,
1913, and reads as follows:

An act divesting intoxicating liquors of their interstate
character in certain cases. Be it enacted, etc., that the ship-
ment or transportation in any manner or by any means what-
soever, of any spirituous, vinous, malted, fermented, or other
intoxicating liquor of any kind, from one state, territory, or
district of the United States, or place noncontiguous to but
subject to the jurisdiction thereof, into any other state, terri-
tory, or district of the United States, or place noncontiguous
to but subject to the jurisdiction thereof, or from any foreign
country into any state, territory, or district of the United
States, or place noncontiguous to but subject to the juris-
diction thereof, which said spirituous, vinous, malted, fer-
mented, or other intoxicating liquor is intended, by any person
interested therein, to be received, possessed, sold, or in any
manner used, either in the original package or otherwise, in
violation of any law of such state, territory, or district of the
United States, or place noncontiguous to but subject to the
jurisdiction thereof, is hereby prohibited.

Eliminating, as we must for the purposes of this case,
the question as to an interstate shipment for the personal use
of the buyer and the consignee, there is no room for doubt
as to the proper interpretation of the act. It does just what
the title says it was intended to do, to wit, divests intoxicating
liquors of their interstate character in certain cases, and these
cases are specifically set out in the act itself. That is to say,
the shipment or transportation of intoxicating liquor from
one state to another, when such shipment is intended by any
person therein to be received, sold, or used in violation of any
law of such state (to which the shipment is made), is pro-
hibited. This is the sum and substance of the act, and that it
has reference to such shipments as are involved in this case
clearly appears.

As already suggested, we have no reason at this time to consider the question of the criminal liability of the defendant under any of the laws of this state, and, as the act of Congress attaches no penalty, there is, of course, no criminal liability under that act. So much as to the interpretation of the act.

II.   We are next brought directly to the real and, to our minds, the only question in the case, and that is the legality and constitutionality of the act. As it is suggested in some

2. SAME: stat-  of the briefs that while Congress has appar-
utes: constitu-  ently acted, and provided a rule of action,
tionality:
penalty.  yet that as the act has no penalty, and there is no sanction, there is in fact no law; we may as well dispose of that proposition at the outset of the discussion reserved for this paragraph of the opinion.

While the term "law" is generally understood, and is quite generally defined, as "a rule of civil action prescribed by the supreme power in a state commanding what is right and prohibiting what is wrong," there has been a good deal of discussion as to whether such rule is of any force or effect unless there be a penalty, or sanction, affixed. But we regard much of this discussion as academic, and are persuaded that either the Congress or the Legislature may make a perfectly valid statute a rule of action, without providing any penalty or sanction. True, a criminal statute which does not prescribe any punishment is without validity; but a great body of our statutory laws has no penalty or sanction attached. For instance, a statute may in terms make certain acts a nuisance, and, if it does so, there is no need to provide the means for enforcement unless the acts are to be made criminal, for a court of chancery, if not a court of law, has the means at hand whereby to make the act effective. Indeed, the best short definition of "statutory law" with which we are familiar is that "it is the written will of the Legislature (which of course includes Congress) solemnly expressed by the forms necessary to constitute it a law of the state." 2 Bouvier's

Law Dictionary, page 543. If the sanction or penalty follows as a matter of course, there need not be any written in the enactment itself. There are, or may be, four parts of a law, to wit: Declaratory, directory, remedial, and vindicatory. The act in question not being penal in character, it needs no vindicatory part. Constitutional provisions, which are the highest forms of law, generally have no sanction or penalty, and no one has heretofore suggested that any is required, even where prohibitions are contained therein. Again, the statute in question is clearly declaratory or remedial (to supply defects or to abridge superfluities), as distinguished from a penal one. *Freeland v. McCullough,* 1 Denio (N. Y.) 422 (43 Am. Dec. 685). Our conclusions as to the validity of the statute as such have support in the following case: *Green v. Penzance,* 6 App. Cas. 617 (45 L. T. Rep. (N. S.) 353).

III. Assuming that the enactment in question is a statute, the other points made against it relate to its constitutionality, and these are substantially as follows:

First. The Webb-Kenyon law is contrary to and in contravention of section 1 of article 1 of the Constitution of the state of Iowa, which among other things provides that all men have the inalienable right of acquiring, possessing, and protecting property, and is contrary to and in contravention of section 9 of said article 1 of the Constitution of the state of Iowa, which among other things provides that no person shall be deprived of life, liberty, or property without due process of law, and that any injunction granted in this cause would be void as in violation of the said provisions of the Constitution of the state of Iowa.

Second. That the Webb-Kenyon law and the Iowa statutes and each of them are void, in that they are contrary to and in contravention of the Constitution of the United States, and particularly section 8, article 1 thereof, which among other things provides that Congress shall have power to regulate commerce with foreign nations and among the several states, and to make all laws which shall be necessary and proper for

carrying into execution the foregoing powers, and all other
powers vested by the Constitution in the government of the
United States; and section 2, article 4 thereof, which pro-
vides that the citizens of each state shall be entitled to all the
privileges and immunities of citizens in the several states; and
article 6 thereof, providing that the Constitution of the United
States and the laws which shall be made in pursuance thereof
are and shall be the supreme law of the land; and article 5
of the Amendments to the Constitution of the United States,
which among other things provides that no person shall be
deprived of liberty or property without due process of law;
and section 1, article 14, of the Amendment to the Constitu-
tion, providing that no state shall make or enforce any law
which shall abridge the privileges and immunities of citizens
of the United States, nor deprive any person of liberty or
property without due process of law, nor deny to any person
within its jurisdiction the equal protection of the laws.˙

Third. That the said so-called Webb-Kenyon law is con-
trary to and in contravention of the said provisions of the
Constitution of the United States, in this, that it purports to
delegate to the several states, and among others the state of
Iowa, the right and power to regulate, interfere with, and
prohibit interstate commerce in intoxicating liquors.

Fourth. That the so-called Webb-Kenyon law is contrary
to and in contravention of the Constitution of the United
States, in that it purports to authorize and sanction as many
different systems of regulation of interstate commerce in in-
toxicating liquors as there are states of the United States,
and that the said statute does not provide for a uniform regu-
lation of said interstate traffic throughout the United States
and give to the citizens thereof the equal protection of the law.

Fifth. That the said so-called Webb-Kenyon law is con-
trary to and in contravention of the provisions of the federal
Constitution above set forth, in this, that it purports to au-
thorize and permit the laws of the state of Iowa in relation to
traffic in intoxicating liquors to have an extra-territorial effect,

and to operate beyond the borders of the state of Iowa as the supreme law of the land to interfere with and regulate interstate commerce in intoxicating liquors originating in states other than Iowa, and terminating in Iowa.

Sixth. That the said so-called Webb-Kenyon law, construed in connection with the said Iowa statutes, is contrary to and in contravention of the said provisions of the Constitution of the United States, in that it purports to give to the state of Iowa power to interfere with and to prohibit the making of contracts in other states between citizens and residents of such other states and citizens and residents of the state of Iowa for the purchase and sale of intoxicating liquors in such other states where such contracts are lawful, and for the delivery in the state of Iowa to the said purchaser thereof at his residence in the state of Iowa.

Seventh. That the said so-called Webb-Kenyon law, construed in connection with said Iowa statutes, is contrary to and in contravention of the said provisions of the Constitution of the United States, in that it purports to give to the state of Iowa power to interfere with and prohibit the making of contracts in other states between this defendant and persons lawfully engaged in the manufacture or keeping for sale, and sale and shipment, of intoxicating liquors in said states for the interstate carriage and transportation by this defendant into the state of Iowa of said intoxicating liquors and the delivery thereof in interstate commerce to the consignee thereof in the state of Iowa.

Eighth. That the said so-called Webb-Kenyon law, construed in connection with the statutes of the state of Iowa, is contrary to and in contravention of the Constitution of the United States, in that it purports to authorize and empower the state of Iowa to interfere with and prevent the delivery by this defendant in interstate commerce to consignees in the state of Iowa of intoxicating liquors lawfully received by this defendant in other states for transportation and there law-

fully contracted to be transported and delivered by this defendant to the consignee thereof residing in the state of Iowa.

Ninth. That the said so-called Webb-Kenyon law, construed in connection with the statutes of the state of Iowa, is contrary to and in contravention of said provisions of the Constitution of the United States, and especially article 3 of said Constitution, in that it purports to prescribe as a regulation of interstate commerce that this defendant, through its agents, shall determine, in advance of the delivery of an interstate consignment of intoxicating liquors to the consignee in the state of Iowa, whether or not it is, or may be, the intention of such consignee to receive, possess, use, or sell such intoxicating liquor in violation of Iowa law, and to interfere with interstate commerce by refusing to perform defendant's contract lawfully made in another state of the United States to transport and deliver said liquor to the said consignee in the state of Iowa, and to interfere with and prevent the performance of the contract made in interstate commerce between the consignor and the consignee of said intoxicating liquors in the event of its being or being believed to be the intention of such consignee to receive, possess, use, or sell such consignment of intoxicating liquors in violation of the laws of the state of Iowa.

Tenth. That by reason of the premises, any decree of this court in this cause granting an injunction against this defendant in any respect as prayed would be void as in contravention of and contrary to the Constitution of the United States in the following among other respects, namely:

(a) It would be a regulation of an interference with interstate commerce by a court having no jurisdiction to interfere with or to regulate interstate commerce.

(b) It would be giving extra-territorial effect to the laws of the state of Iowa, in that it would amount to a nullification of contracts made in another state and lawful under the laws of the state where made, by and between a consignor and a consignee of intoxicating liquors.

(c) It would deprive the several consignees of the said shipments of intoxicating liquors hereinbefore referred to of their liberty guaranteed to them by the provisions hereinbefore quoted of the Constitution of the United States and the amendments thereof, to have transported to them in interstate commerce for their personal use in the state of Iowa, a legitimate article of interstate commerce as recognized and defined by the laws of the United States and of the commercial world, namely, beer and other intoxicating liquors.

(d) It would give extra-territorial effect to the laws of the state of Iowa, in that it would amount to a nullification of lawful contracts for interstate transportation lawfully made in the state of Illinois between the defendant, the United States Express Company, and the consignor of said intoxicating liquor, for the interstate transportation of said intoxicating liquors by the defendant, the United States Express Company, and would submit this defendant to liability for damages and penalties for failure and refusal to carry beer and other intoxicating liquors as a lawful subject-matter of interstate commerce when lawfully tendered for shipment into the state of Iowa by persons and corporations lawfully dealing in and selling and shipping intoxicating liquors, in states of the United States other than the state of Iowa.

(e) It would be an interference with the performance of contracts made in interstate commerce, by a court of the state of Iowa, under the laws of the state of Iowa, in relation to a subject-matter of interstate commerce over which the Congress of the United States and the courts of the United States alone have jurisdiction.

(f) It would be a regulation of interstate commerce by the state of Iowa.

(g) It would be based upon the requirement that this defendant should exercise the exclusive function of Congress and of the courts of the United States to regulate and enforce the regulation of interstate commerce.

These claims are somewhat involved, and out of an abund-

ance of caution they of necessity overlap, and as a result it
will be necessary to reduce them to their lowest terms, in order
to have any intelligent comprehension of the matter to be de-
cided. Nothing is lacking in the arguments presented, and
from them we are enabled to gather the exact propositions
involved.

The transactions involved were in interstate commerce,
and if Congress had not acted, under its power derived from
the Constitution itself, there could be no doubt of the propo-
sition that the state laws would be inoperative,
because the state itself cannot regulate inter-
state commerce, even in the exercise of its
police power; and the ultimate question here is: Has Con-
gress, in virtue of its power over interstate commerce, acted
in the premises, and, if so, is its enactment valid?

3. INTERSTATE
COMMERCE:
power to regu-
late.

The first and only serious contention, as we view it, is
whether or not the Webb-Kenyon act is complete in itself, or
is it simply a delegation of power to the state to act for Con-
gress in the matter. If the latter, then the act
cannot be sustained. It will be observed at
the outset that save for the want of a penalty
or sanction in the act itself, as already pointed
out, the act is complete in itself, and that, according to many
decisions which might be cited, it is uniform in its opera-
tion; that is, that it applies alike to all similarly situated,
and, of necessity, to all who may, in the future, come within
its provisions. There can be no doubt that the Congress, in
virtue of its power over interstate commerce, might, in its
discretion, put its ban upon all transportation of liquors in
interstate shipment, just as it has done with lottery tickets,
the shipment of liquors to Indians, the method of shipment
of liquor by express companies, the shipment of game, the ·
carriage of infected live stock, the white slave traffic, etc.
All of these and other like acts were passed to aid states
which came within their provisions in the enforcement of
local laws which they deemed of vital importance to their

4. SAME: consti-
tutional law:
delegation of
congressional
power.

citizens; in other words, to aid them in the enforcement of their police regulations. The act simply removes the bar theretofore existing to the enforcement of police regulations, because of the interstate character of the transaction; and, if it be within the power of the Congress to forbid the shipment of all liquors in interstate traffic, no logical reason is perceived why it may not do less, and forbid the shipment under certain conditions.

There are no words of delegation in the act itself, and the theory of it undoubtedly is that liquors intended for use, contrary to state rules, should be an outlaw of interstate commerce, and neither the shipper nor the carrier may say that the state is interfering with interstate commerce, for the reason that the right of such shipments between the states is denied by federal legislation. It is true that the effect of the act is to give the states more power, but there is no such express delegation, and the language of the act is in no sense permissive. The act is prohibitory in character, and acts not upon states, but upon articles of commerce. Interstate commerce in these things is prohibited under certain conditions, and, as we shall presently see, the act is uniform in its operation.

The principles announced in *State of Iowa v. Forkner*, 94 Iowa, 1, are applicable here, particularly the discussion on pages nine to seventeen, inclusive. From the earliest history of the country, Congress has, in the exercise of its legitimate function, given force and effect to state laws. In the year 1803, and while Mr. Jefferson was President, Congress passed a law forbidding the transportation of free negroes from one state to another where they were not permitted by the laws of the state to reside. 2 Stat. Law, 205, Act of Feb. 28, 1803, chapter 10. The white slave act forbids the transportation of women for immoral purposes, and these immoral purposes may be defined by state laws. See *Hoke v. U. S.*, 227 U. S. 308 (33 Sup. Ct. 281, 57 L. Ed. 523, 43 L. R. A. (N. S.) 906, Ann. Cas. 1913-E, 905). The

Lacey act forbids the transportation in interstate commerce of game killed in violation of local laws. Crim. Code, section 242 (Act March 4, 1909, chapter 321, 35 Stat. 1137 (U. S. Comp. St. Supp. 1911, page 1663). And the Wilson act had the effect of making state laws apply to liquor shipped to be sold in original packages. Most, if not all, of these acts have been directly sustained by court decisions. See *Rupert v. U. S.,* 181 Fed. 87 (104 C. C. A. 255) ; *Silz v.* Hesterberg, 211 U. S. 31 (29 Sup. Ct. 10, 53 L. Ed. 75) ; *In re Rahrer,* 140 U. S. 545 (11 Sup. Ct. 865, 35 L. Ed. 572). Again, the judiciary act of 1789 expressly provided ''that the laws of the several states shall be rules of decision in trials at common law in the courts of the United States, in cases where they apply.'' Act Sept. 24, 1789, chapter 20, 1 Stat. 73. And this has always been regarded as a legitimate exercise of federal power, and not a delegation of power. See *Golden v. Prince,* Fed. Cas. No. 5,509. And nothing was found objectionable in this because the states, or some of them, might in the future change their rules of practice. Other instances might be cited, but these are deemed sufficient. See, however, a discussion of the subject in a learned article by James D. Barnett, in 2 Am. Political Science Review, page 347.

We may as well close this part of the discussion by quoting the following from *In re Rahrer, supra:*

In the case at bar, petitioner was arrested by the state authorities for selling imported liquor on the 9th of August, 1890, contrary to the laws of the state. The act of Congress had gone into effect on the 8th of August, 1890, providing that imported liquors should be subject to the operation and effect of the state laws to the same extent and in the same manner as though the liquors had been produced in the state; and the law of Kansas forbade the sale. Petitioner was thereby prevented from claiming the right to proceed in defiance of the laws of the state, upon the implication arising from the want of action on the part of Congress up to that time. The laws of the state had been passed in the exercise

of its police powers, and applied to the sale of all intoxicating liquors whether imported or not; there being no exception as to those imported, and no inference arising, in view of the provisions of the state Constitution and the terms of the law (within whose mischief all intoxicating liquors came), that the state did not intend imported liquors to be included. We do not mean that the intention is to be imputed of violating any constitutional rule, but that the state law should not be regarded as less comprehensive than its language is, upon the ground that action under it might in particular instances be adjudged invalid from an external cause. Congress did not use terms of permission to the state to act, but simply removed an impediment to the enforcement of the state laws in respect to imported packages in their original condition, created by the absence of a specific utterance on its part. It imparted no power to the state not then possessed, but allowed imported property to fall at once upon arrival within the local jurisdiction. It appears from the agreed statement of facts that this liquor arrived in Kansas prior to the passage of the act of Congress, but no question is presented here as to the right of the importer in reference to the withdrawal of the property from the state; nor can we perceive that the congressional enactment is given a retrospective operation by holding it applicable to a transaction of sale occurring after it took effect. This is not the case of a law enacted in the unauthorized exercise of a power, exclusively confided to Congress, but of a law which it was competent for the state to pass, but which could not operate upon articles occupying a certain situation until the passage of the act of Congress. That act in terms removed the obstacle, and we perceive no adequate ground for adjudging that a re-enactment of the state law was required before it could have the effect upon imported, which it had always had upon domestic, property. Jurisdiction attached, not in virtue of the law of Congress, but because the effect of the latter was to place the property where jurisdiction could attach.

In *Gibbons v. Ogden*, 9 Wheat 1 (6 L. Ed. 23), it appeared that Congress passed an act providing that: "Until further provision is made by Congress, all pilots . . . shall continue to be regulated in conformity with the exist-

ing laws of the states respectively wherein such pilots may be, or with such laws as the states respectively may enact for the purpose." Chief Justice Marshall, in speaking of the validity of this act, said:

Although Congress cannot enable a state to legislate, Congress may adopt the provisions of a state on any subject. When the government of the Union was brought into existence, it found a system for the regulation of its pilots in full force in every state. The act . . . adopts this system, and gives it the same validity as if its provisions had been specially made by Congress. But the act, it may be said, is prospective also, and the adoption of laws to be made in future presupposes the right in the maker to legislate on the subject. The act unquestionably manifests an intention to leave this subject entirely to the states, until Congress should think proper to interpose; but the very enactment of such a law indicates an opinion that it was necessary; that the existing system would not be applicable to the new state of things, unless expressly applied to it by Congress. . . . The acknowledged power of a state to regulate its police, its domestic trade, and to govern its own citizens, may enable it to legislate on this subject to a considerable extent; and the adoption of its system by Congress, and the application of it to the whole subject of commerce, does not seem to the court to imply a right in the states so to apply it of their own authority. But the adoption of the state system being temporary . . . shows, conclusively, an opinion that Congress could control the whole subject, and might adopt the system of the states, or provide one of its own.

This act and the acts recognizing the validity of state health laws, and certain other acts, he thinks show an opinion of Congress "that the states retain powers enabling them to pass the laws to which allusion has been made."

See, also, to the same effect, *Cooley v. Board of Wardens,* 12 How. 299 (13 L. Ed. 996); *The Panama, Fed. Cas. No. 10,702; The Clymene* (D. C.) 9 Fed. 164; *Opinion of the Justices,* 22 Pick. (Mass.) 571; *Van Allen v. Assessors,* 3 Wall. 573 (18 L. Ed. 229); *New York v. Weaver,* 100 U. S. 539 (25

L. Ed. 705); *Farmers' Bank v. Dearing,* 91 U. S. 29 (23 L. Ed. 196); *Ex parte Jervey* (C. C.) 66 Fed. 957; *Bowman v. Railroad,* 125 U. S. 465 (8 Sup. Ct. 689, 1062, 31 L. Ed. 700); *Schollenberger v. Pennsylvania,* 171 U. S. 1 (18 Sup. Ct. 757, 43 L. Ed. 49); *Blair v. Ostrander,* 109 Iowa, 204; *Central Pac. R. R. v. Nevada,* 162 U. S. 512 (16 Sup. Ct. 885, 40 L. Ed. 1057); *Hanover Bank v. Moyses,* 186 U. S. 181 (22 Sup. Ct. 857, 46 L. Ed. 1113); *Morgan v. Board of Health,* 118 U. S. 455 (6 Sup. Ct. 1114, 30 L. Ed. 237).

Apt quotations might be made from each and all of these cases, which hold that such an act as the one before us is either permissive in its nature, or adoptive of the laws of the states, and that in either event there is no delegation of power to the states. It will be noticed too, in reading these cases, that the objection that there might be as many rules as there were different states, met with no favor, and was either held to be without merit or entirely disregarded.

We may well quote in closing this part of the discussion, from the remarks of Senator Hoar, in discussing the Wilson act (Act Aug. 8, 1890, chapter 728, 26 Stat. 313, U. S. Comp. St. 1901, page 3177) when it was before the Senate of the United States, as follows: ''Congress may say the power to engage in interstate or international commerce shall not be understood as permitting anybody to sell opium or intoxicating liquors to any one else, and that they shall be excluded altogether from the domain of interstate commerce. That Congress has a right to say. . . . That is not a question of delegated power. It is not a question of permission to the state. It is a question of the right of Congress to prescribe what shall be the limit of interstate commerce.''

This is a very clear statement of the rule, and to our minds leaves nothing to the argument that the act in question is a delegation of power to the state.

IV. It is said, however, that the act denies the equal protection of laws in that it does not apply to all alike; that,

if the act had forbidden the shipment of all liquors in inter-

5. SAME: consti-   state commerce, it might be valid, but that, as
tutional law:
equal protec-   it does not do so, it gives privileges and im-
tion.
munities to some persons not possessed by
others. This too is fallacious, in that it overlooks the un-
doubted right of Congress to prohibit some shipments in
interstate commerce and to permit others. The real ques-
tion here is: Is the classification arbitrary, and unjust, and
based upon no substantial difference? The classification is
manifestly just, or at least it is not arbitrary. It applies
to all in a like situation. Congress has passed acts forbid-
ding the interstate shipment of adulterated foods, of falsely
labeled food, of obscene literature, of explosives, of dis-
eased cattle, of women under certain conditions; of commod-
ities owned by railroads other than lumber; has declared
intoxicating liquors nonmailable; prohibited .C. O. D. ship-
ments of liquor, and the false marking of packages contain-
ing liquor. But more important still, the Supreme Court
of the United States has upheld a state statute prohibiting
the shipment in intrastate commerce, from a wet county in
the state into a dry one. *Louisville & N. R. R. v. Cook*, 223
U. S. 70 (32 Sup. Ct. 189, 56 L. Ed. 355). This decision,
to our minds, determines the problem now before us.

V. That the law is uniform in its operation is hardly
debatable; and that it gives privileges and immunities to
citizens of one state, not possessed by others under the same

6. SAME: consti-   circumstances, is wholly without merit. The
tutional law:
special privi-   act grants no privileges or immunities, and is
leges.
not subject to this objection lodged against it.
*Butte Co. v. Baker*, 196 U. S. 119 (25 Sup. Ct. 211, 49 L. Ed.
409); *Delamater v. South Dakota*, 205 U. S. 93 (27 Sup. Ct.
447, 51 L. Ed. 724, 10 Ann. Cas. 733); *In re Rahrer, supra;
Friedman case,* 191 Fed. 682 (112 C. C. A. 219); *State v. Grier*
(Del.) 88 Atl. 579; *Crowley v. Christensen*, 137 U. S. 86 (11
Sup. Ct. 13, 34 L. Ed. 620); *Mugler v. State of Kansas*, 123
U. S. 623 (8 Sup. Ct. 273, 31 L. Ed. 205); *Railway v. U. S.*

231 U. S. 363 (34 Sup. Ct. 65, 58 L. Ed.—) ; *Buttfield v. Stranahan,* 192 U. S. 470 (24 Sup. Ct. 349, 48 L. Ed. 525) ; *Hanover Bank v Moyses,* 186 U. S. 181 (22 Sup. Ct. 857, 46 L. Ed. 1113).

There is no absolute right to sell liquors in any state. That is a matter of police regulation, and the act of Congress neither gives nor protects that right. In *Crowley v. Christensen,* 137 U. S. 86 (11 Sup. Ct. 13, 34 L. Ed.

7. SAME: constitutional law: due process.
620), the Supreme Court of the United States said: ''The statistics of every state show a greater amount of crime and misery attributable to the use of ardent spirits obtained at these retail liquor saloons than to any other source. The sale of such liquors . . . has therefore been, at all times, by the courts of every state, considered as the proper subject of legislative regulation. . . . The police power of the state is fully competent to regulate the business—to mitigate its evils or to suppress it entirely. There is no inherent right in a citizen to thus sell intoxicating liquors by retail; it is not a privilege of a citizen of the state or of a citizen of the United States. As it is a business attended with danger to the community, it may, as already said, be entirely prohibited, or be permitted under such conditions as will limit to the utmost its evils.'' See, also, *Mugler v. Kansas,* 123 U. S. 623 (8 Sup. Ct. 273, 31 L. Ed. 205) ; *Kidd v. Pearson,* 128 U. S. 1 (9 Sup. Ct. 6, 32 L. Ed. 346).

It is manifest, of course, that under the act no one is deprived of his property without due process of law. *Eilenbecker v. Dist. Court,* 134 U. S. 31 (10 Sup. Ct. 424, 33 L. Ed. 801) ; *Barbier v. Connolly,* 113 U. S. 27 (5 Sup. Ct. 357, 28 L. Ed. 923).

We cannot better close this discussion than to quote the following from the Supreme Court of Delaware, found in *State v. Grier,* 88 Atl. 602 *et seq.*:

The history of legislation, as well as of decisional law, upon the subject, is interesting. The 'License Cases' held that

the sale of interstate intoxicating liquor might be prohibited by the state even in the absence of a federal law. Subsequently the Supreme Court decided that the state could not prevent such sale in original packages. Later the Wilson act was passed, and the court held it to be constitutional, and that it gave the state the right to prohibit the sale of an interstate shipment of intoxicating liquor, even in the original package, after arrival at destination.

8. SAME: interstate commerce: regulation of liquor traffic.

That was the purpose and extent of the Wilson act, as interpreted by the Supreme Court. The Webb-Kenyon act was passed to supply the deficiency in the Wilson law, and make the transportation, as well as the sale, of interstate intoxicating liquors subject to state law. Such a law was necessary to give the state the right to prevent a traffic in an article which the Legislature believed to be detrimental to the health and welfare of its citizens. We think the federal statute should be broadly and reasonably construed, so as to protect the state in the exercise of such right, and we further think that such a construction would not be in conflict with the principle of any decision heretofore made by the Supreme Court, under the commerce clause of the Constitution of the United States. Indeed, we are satisfied that such a construction would be in harmony with the principle and reasoning of all the decisions of said court upon the subject since the passage of the Wilson act.

There can be no doubt that under the decisions of the Supreme Court, the following principles may be regarded as fully established:

(1) That the police power is inherent in the state, and is given a scope and exercise within the state commensurate with what the Legislature reasonably believes to be necessary for the protection and preservation of the health, morals, and welfare of the citizens.

(2) That the manufacture and sale of intoxicating liquor is a subject of police regulation by the state.

(3) That the state may, in the *bona fide* exercise of its police power, make unlawful the manufacture, sale, and transportation of intoxicating liquor, as injurious to the health and safety of its inhabitants, and that by an act of Congress such liquor can be divested of its interstate commerce character sooner than would otherwise be the case.

Therefore we think it logically and necessarily follows

that Congress has the power to prohibit the shipment of intoxicating liquor into a state having such law, and by such prohibition the article is taken out of the sphere of legitimate interstate commerce within the state.

In other words, Congress may, under its power to regulate commerce between the states, supplement, and in effect ratify, the prohibitory laws of the state, by extending the prohibition to interstate shipments.

In the *Lottery Case,* reported in 188 U. S. 358, 360, 361 (93 Sup. Ct. 321, 329, 47 L. Ed. 492), it was held that the carriage of lottery tickets from one state into another, by independent carriers, is interstate commerce, and may be prohibited by an act of Congress; and in the course of its opinion the court said: 'So that we have in the *Rahrer* case a recognition of the principle that the power of Congress to regulate commerce may sometimes be exerted with the effect of excluding particular articles from such commerce.' To the same effect is *Pabst Brewing Co. v. Crenshaw,* 198 U. S. 24, 40 (25 Sup. Ct. 552, 49 L. Ed. 925), in which the court agreed with the reasoning in the *Rahrer* case.

In *Foppiano v. Speed,* 199 U. S. 517 (26 Sup. Ct. 138, 50 L. Ed. 288), the validity of a state license for sales of intoxicating liquors on ferryboats running from one state to another was sustained.

The case of *Plumley v. Massachusetts,* 155 U. S. 474 (15 Sup. Ct. 161, 39 L. Ed. 223), sustained the prohibition of the sale of oleomargarine not colored yellow, although it was imported. In that case the court said: 'The judiciary of the United States should not strike down a legislative enactment of a state, especially if it has direct connection with the social order, the health, and the morals of its people, unless such legislation plainly and palpably violates some right granted or secured by the national Constitution,' etc.

The prohibition of the transportation of intoxicating liquor is considered, when supplemented and reinforced by an act of Congress, as taking from intoxicating liquors their character of interstate commerce, and placing them in the same category as lottery tickets, oleomargarine, deleterious drugs, the interstate transportation of which may unquestionably be prohibited.

We are fully convinced that when a state seeks by positive law, enacted in the fair and reasonable exercise of the police power, to prohibit the manufacture and sale of intoxicating

liquors within its limits, and in order to make such law more effective seeks to regulate the transportation of such liquors by prohibiting the bringing or carrying of the same into its local option territory by common carriers and liquor dealers, such transportation being substantially connected with the forbidden sale, and also prohibited by an act of Congress, the state legislation should and can be sustained under both state and federal Constitutions. In view of the wide latitude accorded to the states in the exercise of the police power, we cannot see how such protection can be denied when the state law is supplemented and reinforced by an act of Congress which was clearly designed to give such protection. And, moreover, it is difficult to see why the conclusion we have reached is not fully sustained by the reasoning of the court in *Re Rahrer* to which we have already referred, and which is not in conflict with any other Supreme Court case. We regard that authority as more in point than any other because it comes nearer to a determination of the crucial question involved in the present case.

The opinion was delivered by Mr. Fuller, then Chief Justice, the question before the court was the constitutionality and effect of the Wilson act, and we quote from the decision the following language as being directly in point, viz.:

'The laws of Iowa under consideration in *Bowman v. Railway Co.,* 125 U. S. 465 (8 Sup. Ct. 689, 1062, 31 L. Ed. 700), and *Leisy v. Hardin,* 135 U. S. 100 (10 Sup. Ct. 681, 34 L. Ed. 128), were enacted in the exercise of the police power of the state, and not at all as regulations of commerce with foreign nations and among the states, but as they inhibited the receipt of an imported commodity, or its disposition before it had ceased to become an article of trade between one state and another, or another country and this, they amounted in effect to a regulation of such commerce. Hence it was held that, inasmuch as interstate commerce, consisting in the transportation, purchase, sale, and exchange of commodities, is national in its character and must be governed by a uniform system so long as Congress did not pass any law to regulate it specifically, or in such way as to allow the laws of the state to operate upon it, Congress thereby indicated its will that such commerce should be free and untrammeled, and therefore that the laws of Iowa, referred to, were inoperative, in so far as they amounted to regulations of foreign or interstate commerce, in inhibiting the reception of such articles within the

state, or their sale upon arrival, in the form in which they were imported there from a foreign country or another state. It followed as a corollary that, when Congress acted at all, the result of its action must be to operate as a restraint upon that perfect freedom which its silence insured.

'Congress has now spoken, and declared that imported liquors or liquids shall, upon arrival in a state, fall within the category of domestic articles of a similar nature. Is the law open to constitutional objection? . . . It does not admit of argument that Congress can neither delegate its own powers nor enlarge those of a state. This being so, it'is urged that the act of Congress cannot be sustained as a regulation of commerce, because the Constitution, in the matter of interstate commerce, operates *ex proprio vigore* as a restraint upon the power of Congress to so regulate it as to bring any of its subjects within the grasp of the police power of the state. In other words, it is earnestly contended that the Constitution guarantees freedom of commerce among the states in all things, and that not only may intoxicating liquors be imported from one state into another, without being subject to regulation under the laws of the latter, but that Congress is powerless to obviate that result.

'Thus the grant to the general government of a power designed to prevent embarrassing restrictions upon interstate commerce by any state would be made to forbid any restraint whatever. We do not concur in this view. In surrendering their own power over external commerce, the states did not secure absolute freedom in such commerce, but only the protection from encroachment afforded by confiding its regulation exclusively to Congress.

'By the adoption of the Constitution the ability of the several states to act upon the matter solely in accordance with their own will was extinguished, and the legislative will of the general government substituted. No affirmative guaranty was thereby given to any state of the right to demand as between it and the others what it could not have obtained before; while the object was undoubtedly sought to be attained of preventing commercial regulations partial in their character or contrary to the common interests. And the magnificent growth and prosperity of the country attest the success which has attended the accomplishment of that object. But this furnishes no support to the position that Congress could not, in the exercise of the discretion reposed in it, concluding that

the common interests did not require entire freedom in the traffic in ardent spirits, enact the law in question. In so doing Congress has not attempted to delegate the power to regulate commerce, or to exercise any power reserved to the states, or to grant a power not possessed by the states, or to adopt state laws. It has taken its own course and made its own regulation, applying to these subjects of interstate commerce one common rule, whose uniformity is not affected by variations in state laws in dealing with such property.

'The principle upon which local option laws, so called, have been sustained, is that, while the Legislature cannot delegate its power to make a law, it can make a law which leaves it to municipalities or the people to determine some fact or state of things, upon which the action of the law may depend; but we do not rest the validity of the act of Congress on this analogy. The power over interstate commerce is too vital to the integrity of the nation to be qualified by any refinement of reasoning. The power to regulate is solely in the general government, and it is an essential part of that regulation to prescribe the regular means for accomplishing the introduction and incorporation of articles into and with the mass of property in the country or state. *Brown v. Maryland,* 12 Wheat. 448 (6 L. Ed. 678).

'No reason is perceived why, if Congress chooses to provide that certain designated subjects of interstate commerce shall be governed by a rule which divests them of that character at an earlier period of time than would otherwise be the case, it is not within its competency to do so.

'The differences of opinion which have existed in this tribunal in many leading cases upon this subject have arisen, not from a denial of the power of Congress, when exercised, but upon the question whether the inaction of Congress was in itself equivalent to the affirmative interposition of a bar to the operation of an undisputed power possessed by the states.

'We recall no decision giving color to the idea that when Congress acted its action would be less potent than when it kept silent.

'The framers of the Constitution never intended that the legislative power of the nation should find itself incapable of disposing of a subject-matter specifically committed to its charge. The manner · of that disposition brought into de-

termination upon this record involves no ground for adjudging the act of Congress inoperative and void.'

, That it was not necessary for the Legislature to reenact our laws, see *Brewing Co. v. Stevens,* 102 Iowa, 60; *Tuttle v. Polk,* 84 Iowa, 12.

9. SAME: congressional legislation: re-enactment of state law.

There is no occasion in this case to determine what is necessary to be shown to make the act of the carrier or of the consignee criminal. No such charge is made; and, if it were, enough appears in the findings of fact made by the trial court to justify a holding that the carrier was aiding or abetting the purchaser in a violation of the law.

Many other matters are discussed, but what has been said disposes of the case.

The trial court was in error in dismissing the petition, and its judgment and decree must be reversed, and the case remanded for a decree in harmony with this opinion.

*Reversed* and *Remanded.*     All the Justices concur.